# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

PATRICK V. O'NEILL,

             Plaintiff,

vs.                                     Case No. 3:17-cv-79-J-32JBT

ST. JOHNS RIVER WATER MANAGEMENT
DISTRICT,

             Defendant.

---

## <u>ORDER</u>

Plaintiff Patrick V. O'Neill was terminated from his position in the Information Technology department at defendant St. Johns River Water Management District ("the District"). The District says O'Neill was fired because he changed the security settings to certain financial programs, resulting in employees being unable to access the programs and causing a disruption to District operations. O'Neill says the real reasons he was fired were because he complained about mismanagement and because he has or was perceived as having a mental disability. This lawsuit followed and the case is now before the Court on defendant's motion for summary judgment.[1]

---

[1] Under the well-established summary judgment standard, the Court views all evidence and draws all reasonable inferences in the light most favorable to plaintiff, but must grant judgment in defendant's favor if the evidence reveals no genuine dispute as to any material fact and if defendant proves it is entitled to the entry of judgment as a matter of law. <u>Furcron v. Mail Centers Plus, LLC</u>, 843 F.3d 1295, 1303-04 (11th Cir. 2016) (citations omitted).

## I.    Background Facts[2]

The District, a public entity legislatively created by the state of Florida, hired O'Neill in 2008 as a Business Application Coordinator, a position within its IT department. Doc. 16, Ex. 1.  By all accounts, O'Neill was a valued staff member who earned praise from his superiors and positive performance reviews for several years. See, e.g., Doc. 20, Ex. 23, 25, 27, 28, 29.  O'Neill's responsibilities increased as he grew in the position, and staffing cuts in 2012 led to additional projects coming under his purview.  Doc. 20, Ex. 29.  In November of 2012, O'Neill experienced psychiatric problems and went on FMLA leave, returning without restrictions in February 2013. Doc. 20, Ex. 3; Doc. 16, Ex. 5.  While he was away, the District's Human Resources Department advised O'Neill's supervisors that he had a serious health condition but provided no additional information.  Doc. 16-4 at Tr.[3] 11.  When O'Neill returned, he says that his supervisor, David Compton, brought O'Neill into his office and asked O'Neill about his health condition, the details of which O'Neill shared in confidence.[4] Doc. 16-2 at Tr. 31-33. O'Neill believes that Compton nonetheless shared details with others because he thereafter perceived that he was treated differently around the

_____

[2]These facts are taken in the light most favorable to plaintiff.

[3]"Tr." cites are to pages of the various deposition transcripts.

[4]Compton denies that this conversation occurred (Doc. 16-3 at Tr. 28) but for purposes of summary judgment, the Court will credit O'Neill's version.

office.[5]  Id.  O'Neill acknowledges that his psychiatrist did not place him on any restrictions and he did not ask for any accommodations or for any change in his job duties or assignments.  Doc. 16-2 at Tr. 36-38, 41-42; Doc. 16, Ex. 5.

In June 2014, O'Neill was assigned to be the project manager for "the Daptiv Project," which involved integrating time records and financial data into the Daptiv software program, a tool used by project managers to estimate the time needed to accomplish future projects.  Doc. 16-7 at Tr. 32, 39-44.  O'Neill became concerned with the accuracy of data going into the Daptiv program, and worried that Daptiv would create inaccurate financial reports that in turn would be provided to the Legislature when the District submitted its budget requests.[6] Doc. 16-2 at Tr. 52-57. O'Neill brought his concerns to Compton and to Compton's supervisor, Kevin Brown. According to O'Neill, they advised him to contact personnel working in Finance, Payroll and Budget if he had questions about the data going into the program.  O'Neill did so, but they did not share his concerns and said the problem must be with the IT

---

[5]In his affidavit, O'Neill states that he tried to return to work for about three days midway through his FMLA leave but was unable to focus and left one afternoon after telling a co-worker that he was experiencing a lot of anxiety.  See Doc. 22, Ex. 71 at ¶¶ 13-14.  Given O'Neill's behavior during that time, knowledge of O'Neill's circumstances among his co-workers could have come from sources other than Compton.

[6]O'Neill never saw any such reports and the Director of the Office of Financial Services testified that Daptiv reports were never used to prepare any financial reports that went to the Legislature.  They were strictly a planning tool used by project managers.  Doc. 16-2 at Tr. 55-57; Doc. 16-7 at Tr. 32, 39-44.

department.  O'Neill ultimately renounced his role as project manager for the Daptiv

Project, believing that if it generated false information, he would be the fall guy.  Doc.

16-2 at Tr. 52; Doc. 16, Ex. 8.  Compton took over as project manager of the Daptiv

Project in August 2014.  Doc. 16, Ex. 8.  Thereafter, O'Neill continued to try to

convince Compton and Brown that the data going into the Daptiv program was

leading to inaccurate reports (his efforts included presenting a PowerPoint

demonstration about it to them, Doc. 20, Ex. 2), but their view was that the integrity

of the reports was not an IT concern.  Doc. 16-3 at Tr. 8-17.  O'Neill states he had

long suspected that the District inflated its figures to secure additional state funding

and his concerns about the data he viewed while working on the Daptiv project was

consistent with that suspicion.[7]  Doc. 16-2 at Tr. 28, 55-57.

In October 2014, O'Neill received an overall rating of 3 (on a 1-5 scale) on his

annual Performance Appraisal.  Doc. 16, Ex. 9.  Compton prepared the Performance

Appraisal with Brown's input.  Doc. 16-3 at Tr. 34-35, 38-39, 47.  In it, Compton

described his disappointment that O'Neill renounced his role as the Daptiv project

manager, explaining that it caused disruption and re-assignments of tasks to other IT

personnel; stated that O'Neill was not relying on his team enough or holding them

accountable; and that he was wasting valuable time by losing focus on IT's role in

---

[7]O'Neill says the initial source of this suspicion came early in his career with the
District when a member of the IT senior management said in a meeting, "We lie to the
governor, we don't tell the governor everything."  Doc. 16-2 at Tr. 55.

4

creating processes for data to move from one system to another, as opposed to being responsible for the data itself, the responsibility for which belonged to the data users. Doc. 16, Ex. 9. The Performance Appraisal included an Addendum of suggested objectives for improvement. Id.

According to O'Neill, it was the worst appraisal he had received in his 18 year career in information technologies. Doc. 16-2 at Tr. 62. Hoping to have his rating changed, O'Neill submitted a written Rebuttal to the Performance Appraisal in November. Id. The Rebuttal discussed his concern that if the Daptiv reports were false, he would be held responsible for providing illegal information. Doc. 16, Ex. 9 at PageID 169. O'Neill testified that when the human resources director reviewed his Rebuttal, she advised him that he could go to the Inspector General with his concerns. Doc. 16-2 at Tr. 73. O'Neill testified that he did not know if going to the Inspector General would be worthwhile because he did not think his concerns would be taken seriously.[8] Id. On December 8, 2014, three weeks after submitting his

_____

[8]O'Neill also wrote in a subsequent response to the Florida Commission on Human Relations that during the time of his employment with the District "[m]anagement became aware that [he] was gathering documents to file a Whistle-blower complaint." Doc. 16, Ex. 20 at Page ID 321. And he testified that he was aware as early as 2014 that the Inspector General was a source for reporting complaints and that Compton had told O'Neill that he would support O'Neill going to the Inspector General if O'Neill had evidence of actual wrongdoing, and would even go with him. Doc. 16-2 at Tr. 74. O'Neill also testified that he knew who the Inspector General was and had seen him in the hallways and in the HR Director's Office. Id. at Tr. 79. All of this is inconsistent with statements in O'Neill's later affidavit (created a month after the District filed its motion for summary judgment) that suggest that he did not know that concerns about

Rebuttal, O'Neill sent an email to the HR director withdrawing it, explaining that in hindsight he could understand management's perspective, that he felt it was his "responsibility to disclose design flaws in the system," and acknowledging that the way to change his supervisors' opinions about him was by showing "outstanding performance on future assignments." Doc. 16, Ex. 9 at Page ID 184.

Beginning in the spring or early summer of 2015, O'Neill became concerned that the GEMS software system used by the finance department (a system for which O'Neill was responsible) might have been breached or was vulnerable to being breached. Doc. 16-2 at Tr. 82-83. He had meetings with his IT co-workers and IT supervisors to explain his concerns, but none of them agreed with him. Id. at Tr. 82-85. According to Compton, O'Neill told at least some employees outside the IT department that there might be hacking or breaches, which caused them to be concerned as well. Doc. 16, Ex. 15 at 42. During that same time frame, O'Neill emailed Compton and Brown to ask whether system upgrades would be part of the next year's budget and he again inquired whether Compton agreed that financial data was being misrepresented as discussed in his earlier Power Point. Doc. 22, Ex. 70

---

fraud or fraud prevention should be taken to the Inspector General or that he did not know how to contact the Inspector General. See Doc. 22, Ex. 71 at ¶ 39. To the extent O'Neill's affidavit statements contradict, without explanation, his clear answers to unambiguous questions at his deposition, the Court rejects them under the sham affidavit doctrine. See Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656 (11th Cir. 1984); Lane v. Celotex Corp., 782 F.2d 1526 (11th Cir. 1986).

at 75-77.

On July 27, 2015, after an IT systems administrator told Compton he was concerned that O'Neill might be planning to restrict the access to GEMS, Compton sent O'Neill an email stating, "Patrick, I don't see any reason to take GEMS or GEMSAPP off of the domain, unless someone can provide a viable reason to remove them."[9]  Doc. 16, Ex. 11-2.  O'Neill responded one minute later, stating that he agreed, and that there had been a misunderstanding.  Id.  In fact, however, O'Neill had already changed the access.  Doc. 16, Ex. 11-1 at 8.  Later that day, the system back-up for the GEMS financial system failed.  Id.  And, the following morning, the IT department realized that all users of the financial system lost their access to it, and no one in the IT department had access either.  Doc. 16-3 at Tr. 52-53.  O'Neill was on a scheduled day off.  Id. at Tr. 53.  The IT personnel went into emergency mode, located a password O'Neill had left in a safe, gained access to the system, and restored users' access as well.  Id. at Tr. 51-53.  While those efforts did not take very long, according to Compton, three weeks later, IT staff were still re-adding permissions to finance staff so they could perform their month-end tasks and Brown

---

[9]Compton explained that domain administrators have access rights to servers where applications, such as GEMS, are run.  If the domain password is changed, access is blocked to the servers (and applications) running within that domain.  Doc. 16-3 at Tr. 70-71.  If the application administrator password is changed and the domain administrator rights are removed, no one can access the application until the new password is located.  Doc. 16, Ex. 11 at 45.

reported seventeen weeks after the incident that some back-up programs were still being repaired as a consequence of O'Neill's actions. Doc. 16, Ex.11-1 at 8; Doc. 21, Ex. 58 at ¶ 15.

The day of the incident, Compton sent O'Neill an email voicing his exasperation that O'Neill had directly countermanded Compton's authority and that of the Network and Systems Coordinator (who had told O'Neill not to change any permissions), creating additional work and a security breach. Doc. 16, Ex. 11-1 at 45. O'Neill responded, taking full responsibility for the event, but expressing surprise that Compton was upset, explaining that he was only trying to tighten security. Id. at 46. When O'Neill returned to work, they had a meeting with Brown, and O'Neill was given instructions not to tamper with anyone's access. Id. at 46-48. He was also instructed not to talk to users in other departments about his security concerns for their systems without first speaking with his supervisors in the IT department, and was prohibited from acting on his security concerns without first discussing it with Compton so the IT team could be involved. Id.

Meanwhile, in anticipation of what would likely be an unfavorable Performance Appraisal, Compton began gathering information about O'Neill's performance during the previous year.[10] Doc. 16-3 at Tr. 73; Doc. 16, Ex.11-1. Compton and Brown met

---

[10]In addition to the GEMS access issue, Compton's report mentioned projects O'Neill successfully completed but also described instances where O'Neill failed to complete projects and argued with his supervisors about their decisions. See Doc.

with HR about O'Neill. Doc. 16-5 at Tr. 14. In late August, Brown presented the information to Lisa Kelley, the District's Chief of Staff.[11] Doc. 16-6 at Tr. 10-16. Upon learning that O'Neill had unilaterally revoked GEMS permissions, she inquired why he was still employed with the District. Doc. 16, Ex. 16 at ¶4; Doc. 23, Ex. 74 at Tr. 81. Brown shared additional incidents from O'Neill's employment history of what Kelley described as O'Neill's "performance issues and insubordination," but to Kelley, the removal of the GEMS permissions without his supervisor's authority was alone an act so egregious that it warranted firing O'Neill. Doc. 16-6 at Tr. 15, 17-19, 22, 34. Kelley testified that even if O'Neill had security concerns, and even if he did not believe his supervisors were responding to protect the systems, he still had no authority to take independent action and should have instead brought his concerns up the chain of command, all the way to the executive office if necessary. Id. at Tr. 18-19. Kelley recalled that during the meeting they reviewed a document that Compton had prepared, but she did not undertake any independent investigation, talk to O'Neill, or review his personnel file before reaching a decision. Id. at Tr. 9-10, 15, 22-23, 42. Based on her meeting with Brown, who recommended that O'Neill be

_____

16, Ex. 11-1. The report also described other instances where O'Neill had raised alarms about what he perceived to be false data that turned out to be accurate. See id. at 2.0 (describing "Position description duplication"), at 3.0 (describing "Terminated employee with active assignment and pay records").

[11]Kelley's testimony was that Compton was present as well (Doc. 16-6 at Tr. 10), but he testified he did not attend a meeting with Kelley (Doc. 16-3 at Tr. 19).

terminated, that is what Kelley determined to do. Id. Kelley thereafter advised the HR department and the District's in-house counsel. Id. at Tr. 24. As part of that process, Kelley learned for the first time that O'Neill had been on FMLA leave in 2012-2013. Id. On September 1, 2015, the District terminated O'Neill. Doc. 16, Ex. 2.

On October 29, 2015, O'Neill submitted a whistle-blower complaint to the Florida Commission on Human Relations, attaching a 40 page report titled "Whistle-Blower Document, Behind the Scenes of the Water Management District," which outlined the various illegal and fraudulent means by which O'Neill believed Florida taxpayers were being cheated by the District.[12] Doc. 16, Ex. 20 & 23. The report included not only information about O'Neill's personal experience working for the District and the culture of dishonesty he perceived, but information he had gathered about the District Board and why he thought several of its members had conflicts of interest that the Governor chose to ignore, concerns that former employees were often given lucrative contracts as consultants to the District, and questions he had about the wisdom of certain District expenditures. Doc. 16, Ex. 23. The complaint was referred to the Inspector General of the District who determined O'Neill had failed to show that the cause of his termination was related to any whistle-blower activity.

_____

[12]At about the same time, O'Neill sent the director of HR a memo attempting to justify why he removed users and IT administrators' access to the GEMS server and requesting that his statement be placed in his personnel file. See Doc. 16, Ex. 10; 16-5 at Tr. 23-25.

The Commission terminated the investigation in June 2016.  Doc. 16, Ex. 24.

O'Neill also filed an administrative charge with the EEOC claiming that because of his actual or perceived disability, he was subjected to different standards, the District failed to make accommodations, and he was wrongfully terminated.  Doc. 16, Ex. 25.  Thereafter, O'Neill filed a complaint in state court claiming the District discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Florida Civil Rights Act, Fla. Stat. § 760 (Count One), and that the District retaliated against him for reporting and disclosing violations of state law, in violation of Florida's Public Whistle-blower's Act, Fla. Stat. § 112.3187 (Count Two).  See Doc. 4.  The District promptly removed the case, invoking federal question jurisdiction based on O'Neill's ADA claim.  See Docs. 1, 3.  Following discovery, the District moved for summary judgment (Doc. 16); O'Neill responded (Docs. 20, 21, 22, 23, 24).

## II.    Discussion

### A.    Count One (ADA and FCRA)[13]

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability in regard to . . . discharge . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "An

---

[13]Disability discrimination claims under the FCRA are analyzed using the same framework as ADA claims; both claims may therefore be considered together.  Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007).

employer who fires a qualified employee with a disability violates the ADA if the employer would not have fired the employee but for her disability." Jones v. Aaron's Inc., ___ F. App'x ___, 2018 WL 4203459, *6 (11th Cir. Sept. 4, 2018) (citing McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996)).

Because O'Neill has no direct evidence of discrimination, the McDonnell Douglas[14] burden-shifting framework applies. Id. (citing Durley v. APAC, Inc., 236 F.3d 651, 657 (11th Cir. 2000)). "Under this framework, [O'Neill] first must establish a prima facie case of ADA discrimination." Id. (citing Durley, 236 F.3d at 655-56). To do so, O'Neill must show that (1) he was disabled, (2) he was qualified for his position at the time he was terminated by the District, and (3) he was discriminated against on account of his disability. Id. (citing Wood v. Green, 323 F.3d 1309, 1312 (11th Cir. 2003)).[15]

Under the ADA, a disability means having "a physical or mental impairment that substantially limits one or more major life activities, . . . a record of such an impairment; or . . . being regarded as having such an impairment." 42 U.S.C. §

---

[14]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[15]If O'Neill proved his prima facie case, the burden of production would shift to the District to show that it had a "legitimate, non-discriminatory reason" for terminating O'Neill. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004). If it did, the presumption of disability would be eliminated and O'Neill would have to put forward evidence upon which a jury could believe that the District's reason was "'unworthy of credence' and a pretext for discrimination." Id. (citation omitted).

12102(1).  In his complaint, O'Neill alleges he "had a mental breakdown due to work related stress" and has "an actual or perceived disability" and/or "record of impairment."  Doc. 4 at ¶¶ 3, 7, 8, 17.  The psychiatrist who completed O'Neill's November 2012 Medical Certification diagnosed him at the time as having had a "brief psychotic disorder; anti-psychotic medication regime initiated with good result."  Doc. 20, Ex. 3.  When asked the direct question whether he is claiming to be disabled, O'Neill testified that he is "claiming [he] was treated differently after [his] hospitalization."  Doc. 16-2 at Tr. 23.  He then continued: "You can talk to my doctor about that.  I don't know– all I know is things changed.  Things are different.  My mind is not the same as it was and I have to take medication now in order to collect my thoughts."  Id.  When further pressed, O'Neill testified that he would have to defer to his doctor as to whether he had any particular condition, explaining that "it's very hard to categorize mentally what you have or do not have and I know that I'm different now and it is different."[16]  Id. at 25.  When asked how he was treated differently, O'Neill answered that after his hospitalization, he was not invited to lunch with his co-workers and felt isolated.  Id. at Tr. 30.  O'Neill also testified that a co-worker whispered to

---

[16]In his later-created affidavit, O'Neill states that his doctor diagnosed him with bipolar disorder, and he further states that he shared this diagnosis with Compton when he returned from FMLA leave in 2013.  See Doc. 22, Ex. 71 at ¶ 16.  Once again, to the extent O'Neill's affidavit statements contradict, without explanation, his clear answers to unambiguous questions at his deposition, the Court rejects them under the sham affidavit doctrine.  Van T. Junkins, 736 F.2d 656; Lane, 782 F.2d 1526.

O'Neill in February 2013 that there were rats in O'Neill's files that he could not chase out (this same co-worker knew O'Neill had had a rat in his garage once before); that in August 2015 Brown remarked to O'Neill while in a meeting with Compton that O'Neill was "chasing ghosts" with regard to his concerns about falsified financial information and the security of the computer system; and that Compton referred to the office area occupied by O'Neill and his two co-workers– one is legally blind and the other has a hearing impairment– as "the island of misfits." Id. at Tr. 30, 35, 44-45. O'Neill testified that these were derogatory comments about his mental health and showed a lack of respect for him. Id. at Tr. 48-49, 115-16.

No reasonable jury could find on this record that O'Neill is actually disabled– his only evidence is his testimony that he has been treating with a psychiatrist every four months since he was hospitalized in November of 2012 and takes preventative medication which helps him organize his thoughts. Id. at Tr. 8-9. Even if a jury also considered the bipolar disorder diagnosis he references in his affidavit, O'Neill presented no evidence about any major life activity in which he is substantially limited. See 42 U.S.C. § 12102(2).

To establish that the District "regarded" O'Neill as disabled, O'Neill must show that the District "perceived him as being substantially limited in a major life activity, regardless of whether he had an actual impairment or not." Corning v. LodgeNet Inter. Corp., 896 F. Supp. 2d 1138, 1149 (M.D. Fla. 2012). O'Neill cannot establish

this either.  Even assuming his supervisors were aware of the reason for his FMLA leave and even if the offending remarks were comments on his mental health, O'Neill has not put forth any evidence that anyone thought he was substantially limited in a major life activity.  See Surtain v. Hamlin Terrace Foundation, 789 F.3d 1239, 1246-47 (11th Cir. 2015) (holding that knowledge that an employee visited a doctor and had a doctor's excuse for not returning to work was not enough to show the employer perceived the employee as disabled); Jenks v. Naples Cmty. Hosp. Inc., 829 F. Supp. 2d 1235, 1254 (M.D. Fla. 2011) ("The mere fact that an employer is aware of an impairment is not sufficient to show that the employer regarded the employee as disabled or that the perception caused an adverse employment action.").

Because O'Neill has not marshaled evidence from which a reasonable jury could conclude that he was disabled within the meaning of the ADA, he cannot establish a prima facie case.  Even if O'Neill demonstrated that he was disabled, he would be unable to show that his disability was a cause of his termination.  O'Neill surmises that Brown, who recommended to Kelley that O'Neill be terminated, knew why O'Neill had taken FMLA leave more than two and half years earlier, but that is merely conjecture.  Kelley likewise testified that she determined to fire O'Neill before she knew about his FMLA leave.  "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)

(quoting Hedberg v. Ind. Bell Tel. Co., Inc., 47 F.3d 928, 931-32 (7th Cir. 1995) (emphasis in original), which rejected plaintiff's contention that because his supervisor knew of his possible health problem, the supervisor likely betrayed his confidence and told the decision-maker, who terminated the plaintiff); see also Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation.") (internal quotation and citation omitted). Even O'Neill testified that the "sole reason for [his] unexpected termination was to disrupt [his] fact finding and treat [him] as a disgruntled employee.," Doc. 16-2 at Tr. 48, testimony that is consistent with his whistle-blower complaint, which likewise makes no reference to any disability. Nor is O'Neill's "cat's paw" theory persuasive here to establish causation– both Brown and Kelley testified that Kelley made the call to terminate O'Neill (Doc. 16-6 at Tr. 34; Doc. 23, Ex. 74 at Tr. 81)– indeed, when she learned about the GEMS server access issue, Kelley wanted to know why the District hadn't already terminated him. See Doc. 16, Ex. 18 at ¶ 8. Even if O'Neill could make out a prima facie case, as discussed below, he would be unable to demonstrate that the District's proffered reason for terminating his employment was pretext.

In his EEOC charge, O'Neill also claims the District failed to accommodate his disability, but his complaint contains no allegations regarding accommodations. See Doc. 16, Ex. 25; Doc. 4. O'Neill testified that the District should have known he

needed an accommodation (though he never explained what the nature of that accommodation would be), and he further admitted that he never asked for an accommodation. Doc. 16-2 at Tr. 36-38, 43. To the extent his ADA claim includes a claim for failure to accommodate, the record is bereft of any evidence to support it. See Frazier-White v. Gee, 818 F.3d 1249, 1255-56 (11th Cir. 2016) ("[A]n employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'") (quoting Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 1999)).

The District is entitled to summary judgment on O'Neill's ADA claim.

## B. Count Two (Whistle-blower Retaliation)

Florida's Whistle-blower's Act is intended to prevent government agencies from taking retaliatory action against employees who report "government wrongdoing to the appropriate officials." Burden v. City of Opa Locka, No. 11-22018-CIV, 2012 WL 4764592, *9 (S.D. Fla. Oct. 7, 2012) (citing Fla. Stat. § 112.3187(2)). "The Act sets forth several specific requirements regarding the types of disclosures protected, to whom those disclosures must be made, who is protected, and the manner in which a remedy must be sought."[17] Id. (citing Fla. Stat. § 112.3187(5)-(8)). As relevant here, the Act provides that a public employer may not retaliate against an employee

---

[17]Among these provisions, the statute requires the exhaustion of certain administrative remedies before filing a complaint. Fla. Stat. § 112.3187(8). O'Neill complied with these provisions.

who reports "in a written and signed complaint" "[a]ny act or suspected act of gross mismanagement, malfeasance, [or] misfeasance . . . committed by an employee or agent of a [public] agency or independent contractor," when the employee discloses that information to the agency or entity as required by the statute. Fla. Stat. § 112.3187(5)(b) and (7). It is an affirmative defense "that the adverse action was predicated upon grounds other than, and would have been taken absent," the employee's protected activity. Fla. Stat. § 112.3187(10).

To establish a prima facie claim for retaliatory discharge under Florida's Whistle-blower's Act, O'Neill must establish that "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events." Rice-Lamar v. City of Fort Lauderdale, 853 So. 2d 1125, 1132 (Fla. 4th DCA 2003) (explaining that elements of Title VII retaliation claims apply to Florida Whistle-blower's Act claims (quoting elements from Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)); see also Addison v. Fla. Dep't of Corr., 683 F. App'x 770, 775 (11th Cir. 2017) (applying McDonnell Douglas burden shifting analysis to Florida Whistle-blower's Act claim (citing Rice-Lamar, 853 So. 2d at 1131-33)); Wagner v. Lee Cty., 678 F. App'x 913, 921 (11th Cir. 2017) (same). If O'Neill can establish a prima facie case, the burden shifts to the District to articulate a legitimate, nonretaliatory reason for the employment action which, if set forth, O'Neill can rebut by showing it was pretext. Addison, 683

F. App'x at 775-76.  Finally, O'Neill must further show "that the protected activity was a 'but-for' cause of the adverse employment action." <u>Scott v. Sarasota Doctors Hosp., Inc.</u>, 688 F. App'x 878, 884 (11th Cir. 2017) (citing <u>Univ. Of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2534 (2013)).  In other words, O'Neill must have "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [District]." <u>Nassar</u>, 133 S. Ct. at 2533.

The District argues that because O'Neill did not submit his whistleblower complaint to the Inspector General until nearly two months <u>after</u> his termination, that activity could not be the cause of his termination.  This is true and O'Neill does not argue to the contrary (in fact, his brief never mentions his whistle-blower complaint).  Instead, attempting to evade this obvious result, he claims that four other actions he took before his termination are protected activity:  first, he presented a PowerPoint demonstration to Compton and Brown in August 2014 explaining the problems with inaccurate financial reports generated from the Daptiv program (Doc. 20, Ex. 2); second, he submitted a rebuttal to HR of his unfavorable Performance Appraisal in November 2014 (Doc. 16, Ex. 9 at PageID 168-70); third, he sent an email to Compton and Brown in April 2015 voicing concerns about reports that misrepresented the underlying financial data (Doc. 22, Ex. 70 at 75-77); and fourth, in July 2015 he participated in an inquiry by Compton about system vulnerability and voiced his concerns.  O'Neill did not bring any of these actions to the attention of the Inspector

General before he was terminated. While the Court has serious doubts that any of these "actions" would be covered by the Act (because of the nature of the actions, the failure to bring them to the Inspector General, and/or the lack of any link between the action and an adverse employment consequence),[18] the Court will assume arguendo that O'Neill has established a prima facie case and turns to the District to consider its reason for terminating O'Neill.

The District explains that O'Neill was terminated because he unilaterally revoked the GEMS permissions without authority. Doc. 16, Ex. 16; Doc. 16-6 at Tr. 15, 20, 53, 66-67; see pp. 7-9, supra. The District has presented a legitimate, non-discriminatory reason, "one that might motivate a reasonable employer." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). Thus, O'Neill must "meet that reason head on and rebut it," by doing more than "simply quarreling with the wisdom of that reason." Id. Pretext can be established by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could them unworthy of credence." Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1274 (11th Cir. 2017) (quotation and citation omitted). O'Neill, who acknowledges

---

[18]For example, O'Neill makes no argument as to why disclosures to anyone other than the Inspector General would be covered by the Act. See Fla. Stat. § 112.3187(6) (describing to whom disclosures must be made). Nor does he demonstrate that any of these actions led to any adverse employment action.

that he changed the GEMS access, claims that he had permission to do so and thus, the District's reason is pretext.[19]  But while O'Neill may have believed he had permission to change the GEMS password for users, he admits he unilaterally took action to revoke the administrators' access as well.  See Doc. 16, Ex. 11-1 at 46; Doc. 22, Ex. 71 at ¶¶ 50, 52.  Moreover, those actions resulted in the GEMS back-up failing, causing the IT department to go into emergency mode to investigate and restore use of the system to all users and network administrators, and caused later disruptions as well.  Additionally, the email Compton sent to O'Neill the day of the incident could not have been more clear in explaining why Compton believed O'Neill's actions were "unacceptable," recounting for O'Neill that both Compton and Palmer (the network and systems coordinator and domain administrator) had both instructed O'Neill not to change permissions, telling O'Neill it was Palmer's responsibility, not O'Neill's, to determine who has access, and explaining that O'Neill's removal of the domain administrators had gone against procedures and created a security breach. See Doc. 16, Ex. 11-1 at 45.  This incident was conveyed to the Chief of Staff who agreed O'Neill's action was unacceptable and fired him.

That O'Neill disagrees with this reason does not undermine the District's decision or make it pretextual.  Indeed, "[t]he employer may fire an employee for a

---

[19]To the extent O'Neill is contending that because he had the ability to take this measure, the District must have also given him the permission to do so is unavailing for obvious reasons.  See Doc. 16, Ex. 10 at 4.

good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." <u>Nix v. WLCY Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1187 (11th Cir. 1984) (citation omitted). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and . . . not on reality as it exists outside of the decision maker's head." <u>Alvarez v. Royal Atl. Devs., Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010). The question is whether the District was dissatisfied with O'Neill for "non-discriminatory reasons, even if mistakenly or unfairly so" or whether it instead merely used this incident "as cover" for retaliating against O'Neill. <u>Id.</u> O'Neill has not put forth evidence from which a jury could reasonably conclude that the District's proffered reason for terminating him was merely pretext for whistle-blower retaliation. Thus, the District is entitled to summary judgment on O'Neill's Whistle-blower's Act retaliation claim.

## III. Conclusion

Accordingly, it is hereby

**ORDERED**:

Defendant St. Johns River Water Management District's Motion for Summary Judgment (Doc. 16) is **granted**. The Clerk shall enter judgment in favor of defendant St. Johns River Water Management District and against plaintiff Patrick V. O'Neill, and shall thereafter close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 24th day of September, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record